**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JANE DOE,<br>        Plaintiff,<br><br>        v.<br><br>CITY OF BOSTON, *et al.*,<br>        Defendants. |

Civil Action No. 20-2948 (CKK)

**MEMORANDUM OPINION**
(June 16, 2021)

In this civil action, Plaintiff Jane Doe alleges that her former employer, the Boston Police Department, retaliated against her by providing falsified and negative employment references to prospective employers with whom Plaintiff applied for a job.  Plaintiff now sues the Boston Police Department, the City of Boston, and a group of unnamed Boston police officers (collectively, "Defendants"), asserting claims under Title VII, the First Amendment, and the common law doctrine of intentional infliction of emotional distress.  In turn, Defendants have filed a [14] Motion to Dismiss, arguing that this Court should dismiss Plaintiff's complaint for lack of personal jurisdiction and because venue is improper.  Alternatively, Defendants request the transfer of this case to the District of Massachusetts.   Upon consideration of the briefing, the relevant authorities, and the record as a whole,[1] the Court will **GRANT IN PART** Defendants' [14] Motion. Specifically, the Court concludes that it lacks personal jurisdiction over the Boston-based

---

[1] The Court's consideration focuses on the following documents:
- Compl., ECF No. 3;
- Defs.' Stmt. of P. & A. in Supp. of Mot. to Dismiss ("Defs. Mot."), ECF No. 14-1;
- Pl.'s Stmt. of P. & A. in Opp'n to Defs.' Mot. (Pl.'s Opp'n"), ECF No. 18; and,
- Defs.' Reply to Pl.'s Opp'n, ECF No. 19.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

Defendants and will, accordingly, **TRANSFER** this action to the District of Massachusetts, in the "interest of justice," pursuant to 28 U.S.C. § 1406(a).

## I.   BACKGROUND

Plaintiff Jane Doe began her career at the Boston Police Department (the "Department") in 2007.  Compl. ¶ 16.  At the outset of her tenure, Plaintiff was one of only "a few women of Asian descent" within the Department.   *Id.*   But according to Plaintiff, the Department harbored a "pervasive culture of sexism."  *Id.* ¶ 18.  For example, Plaintiff was allegedly told that she "must be either a bitch or a lesbian" given her interest in police work and was advised to "be careful with her male colleagues."  *Id.* ¶ 17.   Notwithstanding this adversity, Plaintiff "worked hard and did well" as a young officer, ultimately receiving a promotion to the Department's "Special Operations Division" in 2009.  *Id.* ¶ 18.

While awaiting transfer into the Special Operations Division, Plaintiff "attended a firearms competition" with her fellow Special Operations officers in August of 2009.  *Id.* ¶ 20.  During the competition, another officer from the Department "violently and repeatedly raped" Plaintiff.  *Id.* ¶ 21.  "After returning to Boston" from the firearms competition, Plaintiff "reported the assaults" to her union representative.  *Id.* ¶ 22.  Then, in September 2009, Plaintiff's union representative notified Plaintiff's Department supervisors of Plaintiff's sexual assault allegations.  *Id.* Immediately thereafter, Plaintiff's supervisors instructed her to "stay home" and take "paid vacation" and "sick leave."  *Id.* ¶ 24.

Following Plaintiff's report of sexual assault, investigators from the Department's Sexual Assault Unit reviewed Plaintiff's allegations and "found no evidence contradicting" her claim.  *Id.* ¶ 32.  The Department, however, still suggested that Plaintiff's assault claim was merely an "opinion," *id.*, and the Department's investigators allegedly advised Plaintiff "not to continue to seek justice," *id.* ¶ 26.  Thereafter, the Department also required Plaintiff to visit a Department-

2

employed psychiatrist, who allegedly asked Plaintiff inappropriate questions about Plaintiff's motives as a police officer and her ethnic heritage. *See id.* ¶ 27. Nonetheless, Plaintiff attended six required sessions with this appointed psychiatrist, *see id.*, and, three different medical professionals subsequently cleared Plaintiff for a return to work, *id.* ¶ 29. Yet despite this clearance, the Department refused to allow Plaintiff to return to work for almost a year. *See id.* ¶ 27. Conversely, the Department permitted Plaintiff's alleged rapist to return to service "less than three months" after the alleged assault. *Id.* ¶ 28. In the following months, Plaintiff's alleged rapist "frequently drove his vehicle to [Plaintiff's] street and parked outside her residence," in an attempt to intimidate Plaintiff and her family. *Id.* ¶ 30.

Plaintiff began to apply for new law enforcement jobs, outside of the Boston Police Department, in 2010. *See id.* ¶ 33–34. Plaintiff explains that she "was motivated to apply for other employment" because the Department had transferred her from the Special Operations team and precluded her from participating in the "type of law enforcement work that she had trained for." *Id.* ¶ 35. Plaintiff was similarly "motivated to find employment outside of Boston because her assailant continued to physically threaten her." *Id.* To date, Plaintiff asserts that she has submitted 135 total job applications, including 111 applications sent specifically to law enforcement agencies. *Id.* ¶ 37. Plaintiff finally left the Boston Police Department in 2014 and moved to Northern Virginia, where she began employment in "the Washington, D.C., metropolitan area." *Id.* ¶ 7. In August 2020, Plaintiff moved to Rhode Island, where she continues to reside today. *Id.* ¶ 1.

Plaintiff alleges that since 2010, the Boston Police Department has purposefully thwarted her efforts to secure a new law enforcement job in retaliation for her rape allegations. Specifically, Plaintiff contends that the Department has either failed to respond to reference requests from

potential employers or, alternatively, provided falsified information that deliberately casts Plaintiff in a negative light. *See id.* ¶¶ 38–39. This includes the Department's decision to provide "negative statements in writing or otherwise about the Plaintiff leading to the denial of her applications," with a number of "D.C. employers." *Id.* ¶ 11. In particular, Plaintiff alleges that she has applied to "over twenty" positions with such D.C. employers, *see id.*, although her complaint only identifies one specific interaction between the Boston Police Department and a District of Columbia employer, *see id.* In that interaction, the Boston Police Department allegedly provided false background information about Plaintiff to the Department of Homeland Security ("DHS"), causing DHS to rescind the tentative job offer it had extended to Plaintiff in 2017. *Id.* ¶ 41. Finally, Plaintiff alleges that after she had finally "obtained employment in D.C.," the Boston Police Department "falsely informed a Washington Post reporter that [Plaintiff] had essentially been terminated from [the Department], which led the reporter to alert [Plaintiff's] D.C. employer" of this allegation. *Id.* ¶ 43. Overall, Plaintiff alleges that the Boston Police Department's conduct has impeded her search for "subsequent long-term law enforcement work," causing damage to Plaintiff's "professional and personal life." *Id.* ¶ 46.

On January 11, 2018, Plaintiff filed an administrative complaint against the Boston Police Department and the City of Boston, before the Massachusetts Commission Against Discrimination (the "MCAD"). *See* MCAD Ruling, ECF No. 14-2, at 4. Therein, Plaintiff alleged that the Boston Police Department and the City of Boston provided "deleterious and false employment history information to prospective employers and journalists," in retaliation for Plaintiff's prior reports of sexual assault. *Id.* at 8. On July 16, 2020, Plaintiff received a letter from the MCAD affirming the dismissal of her administrative claim before the agency. Compl. ¶ 12. Within ninety days of her MCAD dismissal, Plaintiff filed this present civil action against the Boston Police Department,

4

the City of Boston, and various unnamed Boston police officers (collectively, "Defendants").  *See id.* ¶¶ 5–9.

In her complaint, Plaintiff asserts three claims against Defendants.  In Count I, Plaintiff asserts a retaliation claim under Title VII, alleging that in retaliation for her prior sexual assault complaints, Defendants withheld background information from Plaintiff's prospective employers or, alternatively, provided them with "negative, false information."  *Id.* ¶¶ 54–55.  In Count II, Plaintiff asserts a constitutional tort claim under 42 U.S.C. § 1983, alleging that Defendants deprived Plaintiff of her First Amendment "right to be free from retaliation."  *Id.* ¶ 58.  Finally, in Count III, Plaintiff raises a common law claim for the intentional infliction of emotional distress, also predicated upon Defendants allegedly intentional dissemination of falsified employment information to Plaintiff's prospective employers.  *See id.* ¶¶ 76–82.  Plaintiff elected to file her present lawsuit in the District of Columbia because "Defendants' actions, which form the basis of this claim, were directed at D.C. employers and prevented [Plaintiff] from filling positions with agencies that are based in D.C."  *Id.* ¶ 13.

On February 25, 2021, Defendants filed the pending motion, seeking the dismissal of Plaintiff's complaint for lack of personal jurisdiction, for improper venue, or, alternatively, to transfer this action to the District of Massachusetts under 28 U.S.C. § 1404(a).  *See* Defs.' Mot. at 1; Fed. R. Civ. P. 12(b)(2), (3).  Plaintiff opposes Defendants' motion in every respect and filed her opposition brief on May 3, 2021.  Defendants filed their reply brief on May 24, 2021.  Accordingly, Defendants' motion is now fully briefed and ripe for this Court's review.

## II.   LEGAL STANDARD

When personal jurisdiction is challenged, the plaintiff bears "the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant."  *Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 456 (D.C. Cir. 1990).  At the pleading stage, the plaintiff "can satisfy that

5

burden with a *prima facie* showing." *Mwani v. bin Laden,* 417 F.3d 1, 7 (D.C. Cir. 2005) (quoting *Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 424 (D.C. Cir. 1991)). "To make such a showing, the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial;" but rather, the plaintiff may "rest her arguments on the pleadings, 'bolstered by such affidavits and other written materials as she can otherwise obtain.'" *Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010) (quoting *Mwani,* 417 F.3d at 7). The plaintiff, however, cannot rely on bare allegations or conclusory statements but "must allege specific acts connecting [the] defendant with the forum." *Second Amendment Found. v. United States Conf. of Mayors,* 274 F.3d 521, 524 (D.C. Cir. 2001) (quotation omitted). "And unlike a motion to dismiss for failure to state a claim, the Court need not confine itself to only the allegations in the complaint, but 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" *Frost v. Catholic Univ. of Am.*, 960 F. Supp. 2d 226, 231 (D.D.C. 2013) (quoting *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)).

## III.   DISCUSSION

For the reasons provided herein, the Court finds that Plaintiff has not met her burden of establishing the existence of personal jurisdiction over Defendants. Rather than dismissing this action, however, the Court will transfer Plaintiff's case to the District of Massachusetts, in an exercise of discretion pursuant to 28 U.S.C. § 1406(a).

## A. Personal Jurisdiction

Defendants move this Court to dismiss Plaintiff's complaint for lack of personal jurisdiction. Personal jurisdiction concerns the Court's power over the parties before it, and such jurisdiction "can either be general or specific." *Adler v. Loyd*, 496 F. Supp. 3d 269, 276 (D.D.C. 2020); *see also Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 888 (D.C. Cir. 2021). General

jurisdiction arises "only when a defendant is 'essentially at home'" in a particular forum.  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)).  In the "paradigmatic" case, "an individual is subject to general jurisdiction in her place of domicile" and a corporation in its "place of incorporation" or "principal place of business."  *Ford Motor Co.*, 141 S. Ct. at 1024. Because Plaintiff does not contend that any Defendant is "at home" in the District of Columbia, the doctrine of general jurisdiction is inapplicable here.[2]

The jurisdictional analysis in this case, therefore, turns on the doctrine of *specific* jurisdiction.  Unlike its general jurisdiction counterpart, specific jurisdiction "covers defendants less intimately connected with a [forum], but only as to a narrower class of claims."  *Id.*  The existence of specific jurisdiction requires that the defendant "take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum[.]'"  *Id.* at 1024– 25 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'"  *Id.* at 1025 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)); *see also Walden v. Fiore*, 571 U.S. 277, 285 (2014). And importantly, the exercise of specific jurisdiction is appropriate only as to those claims that "arise out of or relate to the defendant's contacts with the forum."  *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S.Ct. 1773, 1780 (2017) (quotation omitted).

"With respect to specific jurisdiction, the Court 'must engage in a two-part inquiry: first examine whether jurisdiction is applicable under the [D.C.] long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."  *Trump*

---

[2] Independently, the Court finds no basis for the proposition that the City of Boston, the Boston Police Department, or the unnamed Boston Police Department officers are "at home" in the District of Columbia. *See Forras v. Rauf*, 812 F.3d 1102, 1106 (D.C. Cir. 2016) (summarily rejecting the existence general jurisdiction absent any supporting jurisdictional allegations).

*v. Comm. on Ways & Means, United States House of Representatives*, 415 F. Supp. 3d 98, 105 (D.D.C. 2019) (quoting *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000)).  For the reasons set forth below, the Court concludes that Plaintiff has not satisfied her burden of establishing specific personal jurisdiction over Defendants within this framework.

### 1. D.C. Long-Arm Statute

The Court must first determine "whether jurisdiction is applicable under the [D.C.] long-arm statute." *Trump*, 415 F. Supp. 3d at 105.  "The D.C. long-arm statute authorizes specific jurisdiction 'over a person, who acts directly or by an agent, as to a claim for relief arising from' certain contacts that person may have with" the District of Columbia. *Id.* (quoting D.C. Code § 13-423(a)).  For qualifying "persons" thereunder, the long-arm statute enumerates seven types of contact with the District of Columbia that support the existence of personal jurisdiction against a defendant.  *See* D.C. Code § 13-423(a)(1)–(7).  In this case, Plaintiff rests her jurisdictional argument on the contacts described in subsections (a)(3) and (a)(4).  *See* D.C. Code § 13-423(a)(3), (4); Pl.'s Opp'n at 17–25.

As a threshold matter, the parties dispute whether the City of Boston, and therefore the Boston Police Department, is a "person" within the meaning of the D.C. long-arm statute.  *See* Defs.' Mot. at 7; Pl.'s Opp'n at 14.  Neither party cites to controlling authority on this question, and the persuasive authority from this jurisdiction is mixed.  *See Fay v. Humane Soc'y of United States*, No. 20-CV-1893 (RCL), 2021 WL 184396, at \*4 (D.D.C. Jan. 19, 2021) (finding that the Town of Wolfeboro, New Hampshire is a "person" under the D.C. long-arm statute); *Black v. City of Newark*, 535 F. Supp. 2d 163, 166 (D.D.C. 2008) (finding that, "as a matter of law, Newark is not a 'person' under" the D.C. long-arm statute.).  As relevant here, however, the Massachusetts statutory code stipulates that "[c]ities and towns shall be bodies corporate," Mass. Gen. Laws Ann.

ch. 40, § 1, and, accordingly, "[t]he city of Boston is a municipal corporation," *Mallory v. White*, 8 F. Supp. 989, 990 (D. Mass. 1934). Given this designation of Boston as a corporate entity, the city appears to fall within the D.C. long-arm statute's definition of a "person," which "includes . . . a *corporation*, partnership, association, or *any other legal* or commercial *entity*." D.C. Code § 13-421 (emphasis added). Regardless, the Court ultimately need not decide this question. Even assuming *arguendo* that each Defendant does qualify as a "person" under the D.C. long-arm statute, Plaintiff has not demonstrated that either subsection (a)(3) or (a)(4) supports jurisdiction over those Defendants, as described in detail below. *See* disc. *infra* at § III.A.1.a–b.

      **a. Subsection (a)(3)**

D.C. Code § 13-423(a)(3) provides for specific jurisdiction over a defendant who "caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia." "Subsection (a)(3) 'is a precise and intentionally restricted tort section, which stops short of the outer limits of due process, and which confers jurisdiction only over a defendant who commits an act in the District which causes an injury in the District, without regard to any other contacts.'" *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (quoting *Moncrief v. Lexington Herald–Leader Co.*, 807 F.2d 217, 221 (D.C. Cir. 1986)). Accordingly, an essential requirement of any exercise of jurisdiction under subsection (a)(3) is a tortious *act* committed by the defendant *within the District of Columbia*.

Plaintiff has failed to plausibly allege any such intra-forum act carried out by Defendants in this case. In her pleadings, Plaintiff relies exclusively on the allegedly negative employment references Defendants made to Plaintiff's prospective employers within the District of Columbia. *See* Pl.'s Opp'n at 19; Compl. ¶ 11. But Plaintiff does not allege in her complaint nor does she argue in her opposition brief that the Boston-based Defendants provided these allegedly negative

references while located within the District of Columbia.   Instead, Plaintiff theorizes that Defendants' negative job referrals took place in the District of Columbia because, according to Plaintiff, the "act" of a retaliatory employment reference "occurs where the prospective employer receives that reference."  Pl.'s Opp'n at 20.

The Court rejects Plaintiff's position.  To begin, Plaintiff impermissibly characterizes the "act" of a retaliatory job reference by relying on the "injury" it causes.  Specifically, Plaintiff contends that the act of a negative job reference only occurs at the point it "incur[s] the capacity to facilitate employment related harm."  *Id.*  But this focus on the "harm" caused by a negative employment reference conflates the location of the injury-causing act with the injury itself.  Such an approach directly contravenes the focus of subsection (a)(3), which intentionally distinguishes between the situs of a tortious injury and the situs of the corresponding tortious conduct.  *See Forras*, 812 F.3d at 1107 ("[S]ubsection (a)(3) draws a sharp line between the act of the defendant and the injury it causes.") (quotation omitted).

Furthermore, the most applicable line of precedent on this issue cuts decidedly against Plaintiff's reading of subsection (a)(3).  In the context of defamation, the D.C. Circuit has consistently found that subsection (a)(3) does not support the exercise of jurisdiction over a non-resident defendant who publishes a defamatory statement in another forum, even if that defendant subsequently directs the statement into the District of Columbia.  *See, e.g.*, *Moncrief*, 807 F.2d at 218–21; *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996); *Forras*, 812 F.3d at 1107.  While a plaintiff may suffer reputational *injury* within the District, the *act* of the defamation itself still occurs where the defendant made the defamatory statements.  *See Moncrief*, 807 F.2d at 221.  Despite Plaintiff's gamely attempts to distinguish such case law, *see* Pl.'s Opp'n at 19–22, the Court finds this defamation precedent to be applicable and highly persuasive.

10

Applying a plain reading of this case law here, the "act" of Defendants' negative employment references occurred in the place where those references were rendered (*i.e.*, Boston), not where they happened to be received or where they might have caused Plaintiff's alleged injury.

By way of example, this Court's jurisdictional analysis in *National Bank of Washington v. Mallery*, 669 F. Supp. 22 (D.D.C. 1987), is illustrative. There, the plaintiff sued an accounting firm for damages caused by the firm's misleading financial report, which convinced the plaintiff to fund a $9.5 million promissory note. *Id.* at 24. To establish personal jurisdiction over the accounting firm in the District of Columbia, the plaintiff relied, in part, on subsection (a)(3) of the D.C. long-arm statute, which requires some intra-forum conduct. *Id.* at 26. The relevant tortious conduct in *Mallery* turned on the accounting firm's "report containing the alleged misrepresentation," which "*was written in Maryland*" but then "sent to [the] plaintiff *in the District of Columbia* for its lending decisions." *Id.* For the purposes of subsection (a)(3), therefore, the *Mallery* Court considered "where the 'act' of misrepresentation [wa]s committed when the misrepresentation [wa]s made outside the District of Columbia but communicated inside the District's bounds." *Id.* Relying on defamation case law as "a useful parallel," the *Mallery* Court noted that "District of Columbia law defines the 'act' of [a defamatory] statement as occurring where the statement was written or spoken, not where it was understood by the third party." *Id.* at 27 (citing *Moncrief v. Lexington Herald–Leader Co.*, 807 F.2d 217 (D.C. Cir. 1986)). The *Mallery* Court "appl[ied] the logic that guided these [defamation] decisions" and found that subsection (a)(3) did not supply jurisdiction over the accounting firm, because the firm's "act of [misrepresentation] occurred in Maryland, where the report was written," not in the District of Columbia where the plaintiff was allegedly deceived. *Id.* This persuasive reasoning in *Mallery* further demonstrates that the "act" of Defendants' allegedly falsified job references occurred in

the place those references were made (Boston), not where they were received (District of Columbia).

Finally, as a matter of common sense, Plaintiff's theory contradicts a straightforward understanding of when and where an "act" occurs.  Again, Plaintiff argues that the "act" of a negative employment reference only occurs in the place where the reference is received, because such an "act" does not take place unless and until it creates "the possibility of [a] tangible, employment-related injury."  Pl.'s Opp'n at 21.  Under this interpretation, however, sending a negative employment reference would not constitute an "act" at all, if the reference was never received.  This defies common sense.  For example, a former employer who sends a falsified voicemail about a former employee has certainly carried out an "act," in the plainest sense of the word.  *See* Black's Law Dictionary (9th ed. 2009) (defining "act" as "[s]omething done or performed").  But what if the malevolent employer happened to dial the wrong telephone number, such that his falsified message never reached its intended recipient?  This error would prevent the impending *injury*, but it would not negate the fact the employer's misguided telephone call still constituted an independent *act*.  Plaintiff's proposed jurisdictional theory does not clearly account for this logical inconsistency, and its adoption would, therefore, undermine the specific focus subsection (a)(3) places on the location of a tortious act, separate and apart from the injury it causes.

For these various reasons, the Court rejects Plaintiff's assertion that Defendants caused a "tortious injury in the District of Columbia by *an act or omission in the District of Columbia*." D.C. Code § 13-423(a)(3) (emphasis added).  Absent such an intra-forum "act," this Court cannot exercise specific jurisdiction over Defendants under subsection (a)(3) of the D.C. long-arm statute. *See Forras*, 812 F.3d at 1107.

### b.  Subsection (a)(4)

Alternatively, Plaintiff contends that Defendants are subject to personal jurisdiction under subsection (a)(4) of the D.C. long-arm statute.  *See* Pl.'s Opp'n at 23–25.  Unlike its statutory neighbor, subsection (a)(3), subsection (a)(4) provides for jurisdiction over a defendant who "caus[es] tortious injury in the District of Columbia by an act or omission *outside* the District of Columbia."  D.C. Code § 13-423(a)(4).  But because subsection (a)(4) reaches tortious conduct beyond the territorial limits of the District of Columbia, an exercise of jurisdiction thereunder requires "something more."  *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987).  Specifically, subsection (a)(4) applies if, *and only if*, the defendant (1) "regularly does or solicits business" in the District of Columbia, (2) "engages in any other persistent course of conduct" in the District of Columbia, or (3) "derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423(a)(4).  Additionally, the defendant's "plus factor" conduct supporting jurisdiction under subsection (a)(4) must be "separate from and in addition to the in-state injury" the defendant allegedly caused.  *Carr*, 814 F.2d at 762.  This requirement serves to "filter out cases in which the in-forum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the [District of Columbia]."  *Id.*  at 763.

To satisfy the "plus factor" requirement here, Plaintiff argues that Defendants have engaged in a "persistent course of conduct" within the District of Columbia.  Specifically, Plaintiff contends that officers from the Boston Police Department attend National Police Week, an annual, week-long event organized by "non-governmental sponsors" and held within the District of Columbia.  Pl.'s Opp'n at 24; *see also* https://nleomf.org/programs-events/national-police-week (last visited June 14, 2021).  Plaintiff alleges that unnamed Boston Police officers "routinely attend" National Police Week, and to support this proposition, Plaintiff cites two specific examples

of Boston police officers traveling into the District of Columbia for National Police Week events. *See id.* First, Plaintiff indicates that in 2015, three Boston police officers received honorary awards during National Police Week within the District of Columbia. *See id.* And second, Plaintiff notes that in 2019, two officers from the Boston Police Department "sang the National Anthem at Police Week's Peace Officers' Memorial Service." *Id.* According to Plaintiff, such conduct demonstrates the Boston Police Department's "routine participation" in National Police Week, which is sufficient to show a "persistent course of conduct" within the District of Columbia, for the purposes of subsection (a)(4). *Id.* at 25.

The Court disagrees. To begin, Plaintiff's allegations regarding the Boston Police Department's persistent course of D.C.-based conduct are notably vague. Plaintiff contends that the Department "routinely participates" in National Police Week, but she makes no mention of this point anywhere in her complaint, nor has she provided any supporting affidavits or record evidence to bolster this otherwise conclusory assertion. Instead, Plaintiff references public source material showing that in 2015 and 2019, respectively, a handful of Boston police officers joined National Police Week to receive awards and sing the national anthem. *See id.* at 24. This type of sporadic conduct, which rests on only two identified trips into the District of Columbia, does not show a persistent course of intra-forum conduct under subsection (a)(4). *See, e.g.*, *The Urban Institute v. FINCON Servs.*, 681 F. Supp. 2d 41, 47–48 (D.D.C. 2010) (finding three trips to solicit business in the District did not create a persistent course of conduct); *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 9 (D.D.C. 2019) ("As to Heavin's alleged [two] visits to D.C. – neither of which relates to this case – there is ample authority rejecting such limited and extraneous contacts under § (a)(4)").

Relatedly, Plaintiff's vague assertions of D.C.-based conduct rely entirely on the unilateral actions of unidentified Boston police officers. *See* Pl.'s Opp'n at 24–25. As noted above,

Plaintiff's jurisdictional allegations focus on the actions of Boston police officers who individually traveled to the District of Columbia to receive National Police Week awards in 2015 and to sing the national anthem in 2019. *See id.* at 24. Yet, Plaintiff does not even allege, let alone demonstrate, that the Boston Police Department itself was involved in any decision by an individual Boston police officer to travel to the District of Columbia for National Police Week. For example, Plaintiff nowhere alleges that the Department *sends* or even *encourages* its officers to attend National Police Week. Put otherwise, Plaintiff has offered no evidence to suggest that Boston police officers who travel to National Police Week do so in their official capacities, as "agents" of the Boston Police Department or the City of Boston. *See* D.C. Code § 13-423(a) (allowing for "personal jurisdiction over a *person*, who acts *directly* or by an *agent*") (emphasis added); *cf. Daughtry v. Arlington Cty., Va.*, 490 F. Supp. 307, 313 (D.D.C. 1980) (finding personal jurisdiction over municipality under § 13-423(a) based upon the conduct of its officer while "acting as an official of the County" and "serv[ing] as an agent of the County"). As such, the jurisdictional conduct Plaintiff relies upon to meet the "plus factor" requirement under subsection (a)(4) is not clearly attributable to the actual defendants in this case.

As a final matter, the jurisdictional significance of the intermittent trips cited by Plaintiff is further reduced by the relationship between National Police Week and the District of Columbia. "District of Columbia courts have . . . recognized that certain activities which occur in this jurisdiction due to its status as the nation's capital should not be considered in the jurisdictional analysis." *Lewy v. S. Poverty L. Ctr., Inc.*, 723 F. Supp. 2d 116, 125 (D.D.C. 2010). For example, under the so-called "government contacts" exception, courts exclude from their jurisdictional analyses "any contacts due to a nonresident's entry into the District of Columbia for the purpose of contacting federal governmental agencies." *Toumazou v. Turkish Republic of N. Cyprus*, 71 F.

Supp. 3d 7, 16 (D.D.C. 2014) (quotation omitted).  Although trips to the District of Columbia for National Police Week do not fit squarely within the "government contacts" exception, the logic behind this doctrine is still germane.  Namely, police officers who participate in National Police Week travel first and foremost to the *event itself*, which just so happens to occur in the District of Columbia, in no small part "due its status as the nation's capital."  *Lewy*, 723 F. Supp. 2d at 125; *see also* https://nleomf.org/memorial (last visited June 14, 2021) (explaining that the National Law Enforcement Officers Memorial is in Washington, D.C.).  While the Court does not exclude Plaintiff's National Police Week allegations from its jurisdictional analysis altogether, the clear connection between National Police Week and the District of Columbia, *as the nation's capital*, minimizes the weight of Plaintiff's National Police Week allegations in the jurisdictional context of subsection (a)(4).

For these reasons, the Court concludes that Plaintiff has not met her burden of demonstrating that Defendants engaged in a "persistent course of conduct" within the District of Columbia.  Absent such a showing or any other applicable "plus factor," the Court finds no basis for the exercise of jurisdiction over Defendants under subsection (a)(4) of the D.C. long-arm statute.

****

In sum, Plaintiff has attempted to establish personal jurisdiction over Defendants under either subsection (a)(3) or (a)(4) of the D.C. long-arm statute.  *See* Pl.'s Opp'n at 17–25.  But, as explained above, Plaintiff has not provided sufficient material to establish the applicability of either subsection in this case.  Accordingly, Plaintiff has failed to carry her burden of plausibly establishing the existence of personal jurisdiction in the face of Defendants' Rule 12(b)(2) motion

for dismissal. *See Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 456 (D.C. Cir. 1990) (explaining that the plaintiff bears the burden of establishing personal jurisdiction).

### 2. Constitutional Due Process

Even if Plaintiff had established jurisdiction under the D.C. long-arm statute, Plaintiff would still need to show that such an exercise of jurisdiction over Defendants "satisfies the constitutional requirements of due process." *Trump*, 415 F. Supp. 3d at 105.  To satisfy this burden, "a plaintiff must show 'minimum contacts' between the defendant and the forum establishing that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *GTE New Media*, 199 F.3d at 1347 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "If the plaintiff relies on a theory of specific jurisdiction, this minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation." *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018) (quotation omitted). Importantly, this analysis "looks to the defendant's contacts with the forum State itself, not [simply] the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014).

Plaintiff has not demonstrated that the exercise of personal jurisdiction over Defendants in this case would be fair and reasonable, as due process requires.  In her opposition brief, Plaintiff focuses exclusively on the "contacts" Defendants supposedly established with the District of Columbia when they "continued to provide false, negative job referrals to [her] prospective employers in D.C." Pl.'s Opp'n at 26.  For example, Plaintiff broadly asserts that her "complaint identifies . . . *multiple instances* in which Defendants' acts or omissions resulted in the loss of an employment opportunity for [Plaintiff] in the District." *Id.*  But the "minimum contacts" analysis for personal jurisdiction focuses expressly on the specific actions of the *defendant* and how those

actions connect him with the relevant forum.  *See Walden*, 571 U.S. at 285.  Through this lens, the relevant jurisdictional conduct in Plaintiff's pleadings is, in fact, quite narrow.  While Plaintiff allegedly applied to over twenty jobs in the District of Columbia *herself*, she identifies only one occasion on which Defendants contacted a prospective D.C. employer, DHS, to provide allegedly false reference information.  *See* Compl. ¶ 41.  Otherwise, Plaintiff points to no other direct contact between Defendants and the District of Columbia.

This job-reference related contact is insufficient to show that Defendants should have "reasonably anticipate[d] being haled into" a District of Columbia court.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980).  As noted, Plaintiff has only alleged one formal contact between Defendants and persons based in the District of Columbia.  *See* Compl. ¶ 41; Pl.'s Opp'n at 25–27.  And importantly, this contact with DHS did not occur because of Defendants' independent efforts to reach into the District of Columbia, but rather because of Plaintiff's decision to apply for a D.C.-based job.  Put otherwise, Defendants' principal D.C.-based contact is directly antecedent to Plaintiff's unilateral decision to move away from Boston and seek employment in the District of Columbia.  Had Plaintiff not done so, Defendants would have had no cause to contact D.C.-based employers about Plaintiff.  The Supreme Court has expressly counseled against predicating specific jurisdiction on such forum-contacts that are so closely tied to the conduct of the plaintiff.  *See Walden*, 571 U.S. at 285; *Fiorentine v. Sarton Puerto Rico, LLC*, 486 F. Supp. 3d 377, 386 (D.D.C. 2020) ("Plaintiffs' jurisdictional theory relies entirely on Mr. Fiorentine's unilateral decision to 'bring' the text messages at issue into this district.  Substantiating an exercise of personal jurisdiction on such an unpredictable connection with the District of Columbia is far too attenuated to satisfy the 'notions of fair play and substantial justice' underwriting constitutional due process.").

Plaintiff's remaining allegations are simply too vague and conclusory to demonstrate sufficient "minimum contacts" between Defendants and the District of Columbia. Apart from her application with DHS, Plaintiff vaguely alleges that Defendants "purposefully engaged in contact with the [other] D.C. employers" with whom she applied, Compl. ¶ 11, but offers no factual allegations or record evidence explaining who these employers were, or when and how Defendants contacted them. When evaluating personal jurisdiction, the Court need not accept such unsubstantiated and ambiguous allegations as true. *See Frost v. Cath. Univ. of Am.*, 960 F. Supp. 2d 226, 231 (D.D.C. 2013), *aff'd*, 555 F. App'x 6 (D.C. Cir. 2014). Relatedly, Plaintiff's claims rely, in part, on the allegation that Defendants were "nonresponsive when . . . potential [D.C.] employers reached out for reference information regarding [Plaintiff]." Compl. ¶ 38. Plaintiff, however, does not rely on this allegation in her opposition brief to support jurisdiction, and for good reason. The Court finds no basis to conclude that Defendants established "minimum contacts" with the District of Columbia by remaining in Boston and *failing to contact* D.C.-based employers.

Finally, Plaintiff's complaint includes a singular allegation that on "another occasion," the Boston Police Department "falsely informed a *Washington Post* reporter that [Plaintiff] had essentially been terminated from [the Boston Police Department] . . . " Compl. ¶ 43. Unlike the allegations of Defendants passively *responding* to D.C.-based job-reference queries, Plaintiff's allegation regarding Defendants' contact with the *Post* shows more affirmative jurisdictional conduct. Nonetheless, this allegation alone does not render jurisdiction constitutionally permissible in this case. As a threshold matter, Plaintiff abandoned this allegation in her opposition brief, making no mention of Defendants' alleged contacts with the *Post* and excluding this alleged conduct from her jurisdictional argument altogether. *See* Pl.'s Opp'n at 12–28. The Court,

19

therefore, will not grant relief in Plaintiff's favor based upon a jurisdictional argument she has not asserted herself.  *See Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 385 n.8 (D.D.C. 2018) ("[T]he Court will not confer on CGSI the benefits of an argument it did not itself raise.").

Regardless, Defendants' alleged contact with the *Post* is simply too ambiguous to establish "minimum contacts" with the District of Columbia.  For example, Plaintiff does not allege where the anonymous *Post* reporter was when he or she talked with Defendants.  Relatedly, Plaintiff does not explain how this contact originated, *i.e.*, whether the reporter solicited a comment from Defendants or whether Defendants themselves sought out the reporter.  Instead, Plaintiff merely alleges that Defendants provided false information to a *Post* reporter on a single occasion.  *See* Compl. ¶ 41.  This open-ended allegation, standing on its own, does not show a "substantial connection" between Defendants and the District of Columbia.  *Cf. Calder v. Jones*, 465 U.S. 783, 788–89 (1984) (finding sufficient contacts with California where the defendants themselves wrote a libelous article, researched using California-based sources).

In sum, Plaintiff has not carried her burden of showing that the Boston-based Defendants in this action have sufficient "minimum contacts" with the District of Columbia.  Exercising specific personal jurisdiction over Defendants, therefore, would not comport with the requirements of constitutional due process.  *See Int'l Shoe Co.,* 326 U.S. at 316.

### 3.  Jurisdictional Discovery

As a final matter, Plaintiff requests contingently that the Court allow her to conduct limited jurisdictional discovery.  *See* Pl.'s Opp'n at 27.  "The D.C. Circuit has consistently held that district courts exercise broad discretion in resolving jurisdictional discovery disputes."  *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 187 (D.D.C. 2018) (citing *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983)).  "[I]n order to get jurisdictional

discovery a plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Caribbean Broad. Sys. Ltd. v. Cable & Wireless, PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998). Furthermore, "a plaintiff must make a 'detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce.'" *Williams v. ROMARM*, 187 F. Supp. 3d 63, 72 (D.D.C. 2013) (quoting *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 53 (D.D.C. 2003)).

The Court will exercise its discretion and deny Plaintiff's request for jurisdictional discovery. The full scope of Plaintiff's argument for jurisdictional discovery provides: "[Plaintiff's] well-pleaded complaint and [her] detailed opposition motion enumerate several meaningful contacts between the defendants and the forum and demonstrate why personal jurisdiction over defendants is both legally sound and fair, raising more than the mere 'specter of jurisdiction' required for jurisdictional discovery to be granted." Pl.'s Opp'n at 27. The Court finds this assertion to be insufficiently detailed to warrant jurisdictional discovery, as it does not clearly direct the Court to any particular source or material Plaintiff would like to review. *See Trump v. Comm. on Ways & Means, United States House of Representatives*, 415 F. Supp. 3d 98, 112 (D.D.C. 2019) (explaining that "generalized requests and predictions are not enough to justify jurisdictional discovery") (quotation omitted).

Finally, the Court notes the apparent inefficiencies attendant to the prospect of jurisdictional discovery in this case. As explained below, the Court will transfer this case to the District of Massachusetts, a court that both parties agree possesses personal jurisdiction over the Boston-based Defendants in this action. *See* disc. *infra* at § III.B. It would seem both improvident and wasteful to permit a round of discovery to test the questionable bounds of this Court's jurisdiction over a set of non-resident defendants, where another federal tribunal with jurisdiction

over those same parties is so readily accessible.  For these reasons, the Court will deny Plaintiff's request for jurisdictional discovery.

**B.  Section 1406(a) Transfer**

In their motion, Defendants alternatively request that the Court transfer this action under 28 U.S.C. § 1404(a) to the District of Massachusetts.  *See* Defs.' Mot. at 16.  Because the Court lacks personal jurisdiction over Defendants, § 1404(a) is not the proper procedural vehicle for such a transfer.  *See Caluyo v. DaVita, Inc.*, 938 F. Supp. 2d 67, 69 (D.D.C. 2013).  Instead, the Court looks to 28 U.S.C. § 1406(a), which allows it, "in the interest of justice," to transfer a "case to any district or division in which it could have been brought," even where that case was originally filed in the "wrong" judicial district.  Of note, § 1406(a) is applicable where, as here, a court lacks personal jurisdiction over the defendants.  *Sinclair v. Kleindienst*, 711 F.2d 291, 294 (D.C. Cir. 1983) (citing *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466–67 (1962)).  Ultimately, the decision of whether to dismiss or transfer a case "in the interest of justice" is committed to the sound discretion of the district court.  *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 789 (D.C. Cir. 1983).  But "[g]enerally, the interest of justice requires transferring such cases to the appropriate judicial district rather than dismissing them."  *Sanchez ex rel. Rivera-Sanchez v. United States*, 600 F. Supp. 2d 19, 22 (D.D.C. 2009).

Here, the Court will exercise its discretion and transfer this action to the District of Massachusetts under § 1406(a), as opposed to dismissing the case outright.  Defendants acknowledge that "[t]his action might have been brought originally in Massachusetts because" the Boston-based Defendants "are residents thereof."  Defs.' Mot. at 17.  Plaintiff similarly concedes that the District of Massachusetts is a suitable forum for this action.  *See* Pl.'s Opp'n at 11. Furthermore, Defendants have not, at least at this time, raised any merits-based defenses that would render this action clearly futile in a court possessing jurisdiction over the parties.  Finally, the Court

notes that prosecuting this action in the District of Massachusetts appears both logical and convenient.  The case itself implicates the relationship between the Boston Police Department and one of its former employees.  Relatedly, the defendants in this action are the Boston Police Department, the City of Boston, and a group of unnamed Boston police officers.  In fact, even Plaintiff herself has resided in *Rhode Island* since the time she filed her present complaint, *see* Compl. ¶ 1, and is, therefore, more proximate to the District of Massachusetts than to this judicial district.  For these reasons, transfer of this action to the District of Massachusetts is appropriate and furthers "the interest of justice."   28 U.S.C. § 1406(a).

## IV.   CONCLUSION

For the foregoing reasons set forth in this Memorandum Opinion, the Court will **GRANT IN PART** Defendants' [14] Motion.  Specifically, the Court concludes that it lacks personal jurisdiction over the Boston-based Defendants and **DENIES** Plaintiff's corresponding request for limited jurisdiction discovery.  Instead, the Court will **TRANSFER** this action to the District of Massachusetts, in the "interest of justice," pursuant to 28 U.S.C. § 1406(a).  An appropriate Order accompanies this Memorandum Opinion.

**Date**:  June 16, 2021

           /s/
           COLLEEN KOLLAR-KOTELLY
           United States District Judge