UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JANE DOE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CITY OF BOSTON, BOSTON POLICE ) <br> DEPARTMENT, and INDIVIDUAL ) <br> OFFICERS, in their individual capacities, ) <br> ) <br> Defendants. ) | Civil Action No. 21-11062-MJJ |

**MEMORANDUM OF DECISION**

January 13, 2025

JOUN, D.J.

On October 19, 2020, plaintiff Jane Doe ("Doe") filed suit against the City of Boston ("City"), Boston Police Department ("BPD"), and unnamed Individual Officers (collectively, "Defendants").[1] [Doc. No. 3]. Doe—a former BPD officer—alleged Defendants had retaliated against her for reporting being raped by a fellow officer and provided false and negative employment references to prospective employers. Specifically, Plaintiff asserted claims under Title VII, 42 U.S.C. § 1983, and common law intentional infliction of emotional distress. Upon Defendants' Motion to Dismiss, this Court had previously dismissed Doe's § 1983 claim and limited Doe's remaining Title VII and emotional distress claims to acts taken after February 2,

---

[1] This Court has held that the City is the only proper institutional defendant, as "BPD is a municipal department and is not an entity that can be sued." [Doc. No. 43 at 1 n.1]. Regarding the unnamed Individual Officers, "there is no individual employee liability under Title VII." *Fantini v. Salem State Coll.*, 557 F.3d 22, 31 (1st Cir. 2009).

2017. [Doc. No. 43]. The Court also limited Doe's emotional distress claims to only those arising under the law of the District of Columbia. [*Id.* at 11].

On June 14, 2024, Defendants filed a Motion for Summary Judgment on all counts. [Doc. No. 102]. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED.

I.      BACKGROUND

A.  **Underlying Allegations and Related Investigations/Charges**

On June 25, 2007, Jane Doe joined BPD when she started at the Academy. [Doc. No. 117, Statement of Material Facts, at ¶ 33]. She graduated from the Academy in December 2007 and was appointed to a probationary police officer position. [*Id.*]. In September 2009, Doe was accepted into the Mobile Operations Unit ("MOP"), a specialized unit of motorcycle officers within BPD's SWAT team operations. [*Id.* at ¶ 36].

On September 23, 2009, Doe informed her husband, Michael Doe, that she had become pregnant after a fellow officer and veteran of the SWAT team, Michael Spence, raped her a month prior on August 25, 2009, while they attended a shooting competition in Farmington, Connecticut. [*Id.* at ¶ 39]. She said that Spence continued to sexually assault her on other occasions after they returned to Boston, threatening to shoot her husband if she did not comply and keep the assault a secret. [*Id.*]. On or around September 23 or 24, 2009, Doe reported the alleged rape to officials at BPD. [*Id.* at ¶ 40]. Shortly thereafter, Doe and Spence surrendered their private and duty firearms to BPD, and they were both placed on paid administrative leave. [*Id.* at ¶¶ 41, 45, 47]. Spence was declared fit to return to duty in November 2009. [*Id.* at ¶ 50]. Doe remained on paid administrative leave until January 2010, when BPD removed Doe from paid leave and required her to use her sick and accrued time. [*Id.* at ¶ 62]. After Doe used up her

2

sick and accumulated time, she was placed on unpaid leave until BPD assigned her to light duty in June 2010. [*Id.* at ¶ 63]. While on light duty, Doe was transferred from MOP to a new district where she would perform administrative work. [*Id.* at ¶ 66].

BPD's investigations of Doe's allegations were assigned to two units: the Anti-Corruption Unit ("ACU"), tasked with investigating all criminal activity by any City employee, and the Sexual Assault Unit ("SAU"), tasked with investigating sex crimes. [Doc. No. 117 at ¶ 68]. From these investigations, BPD determined that Doe and Spence had a "consensual sexual relationship;" it could not prove that a sexual assault had occurred. [*Id.* at ¶ 75]. On November 2, 2010, the Suffolk County District Attorney's Office announced it had found insufficient evidence to bring criminal charges against Spence. [*Id.* at ¶ 76]. Investigations were also opened at the Farmington Police Department in Connecticut and the Milton Police Department in Massachusetts, and both departments likewise closed their investigations without bringing charges against Spence. [*Id.* at ¶ 77].

In October 2012, then-Sergeant Detective Philip Owens of the ACU filed a complaint with Internal Affairs Department ("IAD"), alleging that Doe had committed various violations of BPD rules. [*Id.* at ¶¶ 18, 88]. IAD then issued a report recommending that 65 rule violations be sustained against Doe.[2] [*Id.* at ¶¶ 19, 89-90]. The recommendation of the IAD report went up the chain of command, and the charges were sustained at all levels, leading up to and including the

---

[2] IAD investigations into officer misconduct result in one of four recommended findings: 1) "sustained," meaning the investigation disclosed sufficient evidence to support allegations in the complaint; 2) "not sustained," meaning the investigation failed to prove or disprove the allegations in the complaint; 3) "exonerated," meaning the action complained of in the complaint did occur, but the investigation revealed that the action was proper, legal, and reasonable; or 4) "unfounded," meaning the investigation revealed that the conduct complained of did not occur. [Doc. No. 117 at ¶ 2]. The recommended findings are made by the ranking officer involved in the IAD investigation, and the IAD report containing the recommended findings for each charge is then forwarded up the chain of command for final approval. [*Id.* at ¶¶ 3-4]. These recommendations become final upon sign-off by the police commissioner. [*Id.* at ¶ 5; Doc. No. 105-25 at 17].

BPD Commissioner on July 13, 2013. [*Id.* at ¶ 20; Doc. No. 105-13; Doc. No. 105-14; Doc. No. 105-25 at 17]. As a result of the charges being sustained, BPD determined that the discipline to be imposed against Doe was the termination of her employment. [Doc. No. 117 at ¶ 21].

Once BPD determines the discipline to be imposed, if the discipline is greater than a five-day suspension, the officer has the right to an administrative internal appeal hearing. [*Id.* at ¶ 7]. Doe appealed the decision in her case with union representation. [*Id.* at ¶ 22]. While her appeal was pending at the internal hearing stage, but before a decision was issued, Doe resigned from BPD, effective May 2014. [*Id.* at ¶ 23; Doc. No. 105-17]. BPD classified her resignation as a resignation with charges pending, and Doe acknowledged and understood that her resignation would be classified as such. [Doc. No. 117 at ¶ 24].

**B. Officer Doe's Job Applications Since February 2, 2017**

Since February 2, 2017, Doe had submitted upwards of 40 applications for jobs, primarily in the law enforcement field. [Doc. No. 117 at ¶¶ 27, 31]. As part of these applications, on at least six occasions, Doe had executed authorizations requesting that her former employers release to her prospective employer employment-related information about her. [*Id.* at ¶¶ 28-29].

BPD regularly receives requests for information regarding the employment of former employees from prospective employers, typically other law enforcement agencies. [*Id.* at ¶ 10]. BPD does not have written rules and procedures under which the department provides information to a requesting agency. [*Id.* at ¶ 12; Doc. 113-9 at 9; Doc. No. 113-10 at 57]. In practice, BPD will not release information about police officer disciplinary status to third parties unless it receives an authorization executed by the former employee, or unless the information is subject to a public records request. [Doc. No. 117 at ¶¶ 11, 16]. At BPD, requests for former employee information fall within the purview of Human Resources ("HR"), which is housed

4

within the Bureau of Administration and Technology ("BAT"). [*Id.* at ¶ 12]. The Superintendent of BAT, Robert Ciccolo, testified that when BPD receives a background check request, he decides which BPD unit should handle it: "General personnel orders would go to HR. Internal affairs records would go to Professional Standards." [Doc. No. 113-9 at 18]. Upon checking for an authorization releasing the requested information, HR produces a copy of the employee's personnel folder, which includes a background investigation file from the initial hiring, a section containing transfer orders, a section containing medical data, a section containing training materials, and personnel orders. [*Id.* at 19-20]. Relative to requests for Internal Affairs records, the Chief of the Bureau of Professional Standards ("BPS"), Phillip Owens, testified that BPD typically provides the requester with the employee's last known status and her disciplinary résumé, indicating if charges were ever brought against her, and if so, their disposition. [Doc. No. 117 at ¶ 12; Doc. No. 113-10 at 56; Doc. No. 113-9 at 21]. BPD would only provide supplemental information about charges on a disciplinary résumé if specifically requested. [Doc. No. 113-10 at 58].

In Doe's case, upon receipt of an authorization from a potential employer, BPD responded with Doe's disciplinary résumé, indicating the disciplinary charges against her, that those charges were sustained by an IAD investigation, and that Doe resigned with those charges pending. [Doc. No. 117 at ¶ 29]. In one instance, Doe applied to work for the United States Department of Homeland Security ("DHS"); upon request, the IAD provided Doe's disciplinary resume to DHS. [Doc. No. 124-1 at 13]. DHS sent an investigator to BPD headquarters to further verify Doe's employment, where the investigator was permitted to review Doe's internal disciplinary record, which was not contained in her employment file. [*Id.* at 13-14]. Doe has also testified that, on occasion, BPD officials discussed Doe's background with prospective

employers and provided negative information. [Doc. No. 117 at ¶ 29; Doc. No. 105-11 at 26-27]. In some instances, Doe withdrew her applications from consideration or otherwise did not pursue those positions. [Doc. No. 117 at ¶ 32].

### C. Washington Post

On March 7, 2017, in response to a public records request by the Washington Post, BPD produced a list of "[t]he names of police officers who since Jan. 1, 2014 to the present have been separated from the department in lieu of termination, discipline, penalty, or proposed termination." [Doc. No. 105-22 at 3]. Doe's name was included on this list. [*Id.* at 4, 6]. Doe testified that, in addition to including Doe's name on this list, BPD officials highlighted her name for Washington Post reporters to specifically contact and attempt to put in an article. [Doc. No. 105-11 at 46]. Doe's name was ultimately not included in the resulting article. [*Id.* at 47; Doc. No. 105-23].

### D. Procedural History

In August 2012, Doe filed suit against BPD in Massachusetts Superior Court, Case No. 1284CV03149, alleging discriminatory and tortious conduct. [Doc. No. 117 at ¶ 26]. That suit was dismissed in September 2013 for failure to timely respond to discovery requests. [*Id.*].

In May 2016, Doe filed a second suit against BPD in Massachusetts Superior Court, Case No. 1684CV01434, alleging discrimination under Mass. Gen. Laws c. 151B, violation of the Massachusetts Civil Rights Act, interference with advantageous contractual relations, defamation, retaliation in violation of Title VII and chapter 151B, and intentional and negligent outrage. [*Id.*; Doc. No. 43 at 3]. In part, the complaint alleged that Doe had been prevented from obtaining employment elsewhere due to "derogatory and defamatory statements" made by the defendants "leading directly to the refusal of an out of state police department to hire her in

October of 2013 and on divers occasions since that time." [Doc. No. 43 at 4]. The action was dismissed for failure to effect timely service, and Doe did not file for reconsideration or appeal after entry of final judgment. [*Id.*].

On February 2, 2017, Doe filed a third action in Massachusetts Superior Court, Case No. 1784CV00350, identical to the 2016 case. [*Id.*]. The defendants moved to dismiss on the ground that Doe's complaint had already been adjudicated on the merits in the 2016 action. A Superior Court judge dismissed the case, concluding that under Mass. R. Civ. P. 41(b)(3), "any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication on the merits," such that dismissal of the 2016 case was a dismissal with prejudice. [Doc. No. 43 at 4]. Doe appealed the Superior Court's dismissal, but the appeal was denied for want of prosecution. [*Id.*].

Doe initiated the present action in the United States District Court for the District of Columbia on October 19, 2020, asserting three claims: retaliation in violation of Title VII (Count I), violation of her First Amendment right to be free from retaliation under 42 U.S.C. § 1983 (Count II), and intentional infliction of emotional distress (Count III). [Doc. No. 3]. Upon Defendants' motion, the District Judge transferred the matter to this district, concluding that the court lacked personal jurisdiction over Defendants. [Doc. Nos. 20-21]. Defendants thereafter moved to dismiss for failure to state a claim. [Doc. No. 30]. On March 15, 2022, this Court dismissed Doe's Title VII claims relating to any allegedly retaliatory acts taken prior to February 2, 2017—the date of filing of the 2017 Superior Court action—noting:

> Doe is in effect requesting that this court overturn both the Superior Court judgment dismissing her 2016 complaint with prejudice and the later Superior Court decision finding that the 2016 judgment was a final adjudication on the merits under Massachusetts law. The court is not at liberty to revisit these issues.

[Doc. No. 43 at 8 (Talwani, D.J.)]. "However, insofar as Doe's claims relate to acts allegedly taken *after* February 2, 2017, they are not precluded," because such claims were not mature at the time the Superior Court actions were filed. [*Id.* at 8-9]. Doe's § 1983 claim was also dismissed in its entirety. [*Id.* at 9-10]. And the Court dismissed any claim for intentional infliction of emotional distress arising under Massachusetts law but, noting that the parties had not adequately briefed the choice of law issue, permitted the claim to proceed under law of the District of Columbia where the alleged conduct occurred after February 2, 2017. [*Id.* at 10-11].

On June 14, 2024, Defendants moved for summary judgment. [Doc. No. 102]. The matter was fully briefed, and the Court heard arguments from the parties on November 20, 2024. [Doc. No. 121].

## II.    STANDARD

Summary judgment is appropriate when, based upon the pleadings, affidavits, depositions, and other materials in the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). Once it has made the requisite showing, the burden shifts to the nonmovant to "present definite, competent evidence to rebut the motion" and demonstrate that a "trialworthy issue persists." *Vineberg v.*

*Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (cleaned up). "'[T]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson*, 477 U.S. at 252). Further, the party opposing summary judgment may not rely on—and the Court may not consider—"conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Clarendon Nat'l Ins. Co. v. Philadelphia Indem. Ins. Co.*, 954 F.3d 397, 404 (1st Cir. 2020). In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990).

### III.    ANALYSIS

#### A.    Title VII Retaliation Claim

"Title VII expressly forbids not only direct discrimination, but also retaliation against an individual who has complained about discriminatory employment practices." *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 114-15 (1st Cir. 2024) (quoting *Velazquez-Ortiz v. Vilsack*, 657 F.3d 64, 72 (1st Cir. 2011)). A prima facie Title VII retaliation case exists if the plaintiff establishes that "(1) the plaintiff engaged in protected conduct, (2) the employer took an adverse employment action, which was (3) in response to the employee's protected activity." *Id.* at 115. "From there, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions," and then "the plaintiff must show that the defendant's explanation is a pretext for unlawful retaliation." *Id.* (cleaned up).

To survive summary judgment on her Title VII claim, Doe must "raise a genuine issue of fact as to whether retaliation motivated the adverse employment action. . . . [A] reasonable jury

must be able to conclude that retaliatory animus was the but-for cause of the adverse action." *Id.* (cleaned up).

### 1. **Prima Facie Case of Retaliation**

Defendants concede that Doe has established the first element of a prima facie case—i.e., that she engaged in protected conduct by reporting sexual assaults she allegedly suffered while employed by BPD. [Doc. No. 103 at 9 n.2]. But they contest that BPD engaged in any adverse employment action in response to Doe's protected activity. I agree with Defendants and find that Doe has produced no evidence which would permit a reasonable jury to resolve the retaliation claim in her favor.

Doe argues that BPD's post-February 2017 release of her disciplinary record constitutes an adverse employment action, primarily on the basis that the information contained in her record was "originally discriminatory, retaliatory, and tortious." [Doc. No. 111 at 3]. In so arguing, Doe posits that "the central issue in this case is whether the information in [Doe's personnel] file was placed there in retaliation for Doe's complaint of having been raped. [*Id.* at 21]. However, as this Court has already held, it is not at liberty to revisit any allegedly retaliatory acts that took place prior to Doe's filing of her Superior Court complaint on February 2, 2017, where Doe already litigated those claims to final judgment in multiple Superior Court actions. *See* [Doc. No. 43 at 8]. In so holding at the motion to dismiss stage, this Court clarified that "both the instant complaint and the 2016 and 2017 actions seek redress for the same alleged wrongs, i.e., that in retaliation for Doe's report that she was sexually assaulted by a fellow officer, the BPD provided false information to Doe's prospective employers, thereby preventing or jeopardizing her future employment"—thus any such claims based on BPD conduct up to February 2, 2017, must be barred. [*Id.* at 7-8]. BPD's pre-2017 conduct may be taken into

account "only to the extent it was legally relevant to what later happened—for example, to help prove the intent behind an act committed after [February 2, 2017], or the act's likely effect on someone like [Doe]." *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 439 (1st Cir. 1997). But such time-barred acts cannot be used as a substitute for proof of actual retaliation during the relevant time period. *Thurston v. Henderson*, 230 F.3d 1347, 1 (1st Cir. 2000) (unpublished).

Contrary to Doe's assertions, the law of the case doctrine does not apply here to open up Doe's retaliation claim to pre-February 2017 acts. Doe relies upon this Court's prior Rule 12(b)(6) and discovery-related rulings, but such rulings were interlocutory and do not constitute law of the case. *See Pérez-Ruiz v. Crespo-Guillén*, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denial of motions to dismiss, . . . do not constitute law of the case."); *see also* 8 Fed. Prac. & Proc. Juris. § 2006 ("A discovery order is[ ] an interlocutory order in the course of proceedings [that] is not appealable."). Moreover, the Court has never ruled directly on Doe's entitlement to post-2017 recovery based on BPD's pre-2017 acts; at most, the previous rulings simply acknowledge that BPD's pre-2017 acts may be relevant to the post-2017 claims at issue.

Turning to Doe's retaliation claims arising from BPD's conduct after February 2, 2017, such claims also fail because Doe has not produced any admissible evidence upon which a rational jury could find that BPD's disclosure of employment information to her prospective employers was retaliatory. This is so where (1) Doe authorized and requested that BPD disclose her employment information; and (2) the record contains no evidence that the manner in which BPD disclosed such information differed from its usual practice or could otherwise be reasonably characterized as adverse.

As to the first point, the record reflects that BPD generally discloses information about a former employee's employment upon receipt of an authorization form by the former employee to

do so, and that Doe signed such forms. [Doc. No. 117 at ¶¶ 10-11, 27-28]. Defendants claim that Doe fully released BPD from all liability for such disclosures through those forms. [Doc. No. 103 at 4]. I note that Defendants produce only a small sample of such releases—from five prospective employers, among the "upwards of 40 applications" Doe submitted, [Doc. No. 117 at ¶¶ 29, 31; Doc. No. 105-21]—and each one differs as to its language and extent of release. In any event, this waiver argument need not be resolved where Doe cannot first establish liability. The greater significance of the forms lies in the fact that, where Doe affirmatively authorized and requested BPD to release her employment records to prospective employers, this undermines her position that BPD then released her records as an adverse retaliatory act. On the record before me, no reasonable jury could find that the City's "desire to retaliate was the but-for cause of the challenged employment action." *Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013)).

      As to the second point, Doe has failed to produce any admissible evidence establishing that the way BPD disclosed her employment and disciplinary information differed from its usual practices or could otherwise be characterized as adverse. Doe relies largely on speculative, hearsay testimony to make her case. For example, Doe alleges that, "[o]n occasions, BPD officials discussed Doe's background with prospective employers and provided negative information via telephone." [Doc. No. 117 at ¶ 29]. The only citation to the record is to Doe's own deposition, wherein she testified learning that BPD had made phone calls to prospective employer North Shore Community College stating that Doe had reported being raped by a BPD officer and that the charges in her disciplinary record had been sustained against her. [Doc. No. 105-11 at 26-27]. But Doe further testified that she could not recall who told her this information, nor could she recall the specifics of the conversation. [*Id.*]. Similarly, Doe testified

she was told by an investigator at the Honolulu Police Department that BPD had provided false information regarding her employment, but she could not "recall specifically in what form" she received this information, nor could she identify the person she spoke with. [Doc. No. 105-12 at 19-20]; *see also* [Doc. No. 105-11 at 43-44]. Doe did not depose any witnesses or identify any documents in the record that might corroborate her testimony. As another example, the Las Vegas Metropolitan Police Department stated in an email to Doe that "[y]our resignation in lieu of termination from a police agency for sustained conduct makes you permanently ineligible for employment with LVMPD." [*Id.* at 32]. At oral argument, Doe's counsel asserted that Doe's resignation status had changed from "resignation with charges pending" to "resignation in lieu of termination," reflecting a retaliatory intent from BPD. But when asked about this change in resignation status, Doe testified, "I do not know specifically where they got that language from," [*id.*]—and produced no other evidence to support the allegation that BPD had changed Doe's resignation status on her records or that it did so with the intent of interfering with her employment applications.

Post-hearing, in supplementation of the record, Doe produced a background investigation report of herself conducted by DHS, dated November 16, 2017. [Doc. No. 124]. The report reflects that a DHS investigator received Doe's disciplinary résumé, produced by BPD per its usual practice in responding to requests for information, "summarizing three cases which had been investigated and 65 counts of misconduct charges." [Doc. No. 124-1 at 13]. The DHS investigator then physically went to BPD headquarters "to obtain verification of [Doe's] employment with the Boston Police Department." [*Id.*]. When asked for Doe's personnel records, BPD officials directed the DHS investigator to Internal Affairs regarding Doe's "internal disciplinary record, which is not contained in her employment file." [*Id.*]. Doe argues that this

13

demonstrates BPD departed from its standard practices in responding to prospective employers' requests for information. But this excerpt, without anything further to corroborate Doe's interpretation, cannot alone provide the basis for a jury to find retaliation. The investigator was never deposed, nor were any other witnesses involved; Doe cannot establish why the investigator went to BPD headquarters, what information DHS sought, what BPD informed the investigator, why BPD directed the investigator to the disciplinary file, or what BPD's typical practice would be when an investigator requests information beyond the disciplinary résumé. *See* [Doc. No. 113-10 at 58 (testifying BPD would provide supplemental information about charges on a disciplinary résumé if specifically requested)].

At bottom, Doe's speculative, hearsay testimony cannot create a factual dispute to defeat summary judgment. *See Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted." (cleaned up)); *Irobe v. United States Dep't of Agric.*, 890 F.3d 371, 381 (1st Cir. 2018) ("A court need not take at face value a party's subjective beliefs, even if offered in the form of testimony, if those subjective beliefs are conclusory, self-serving, and lack factual support in the record." (cleaned up)); *see also Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) ("Statements predicated upon undefined discussions with unnamed persons at unspecified times are simply too amorphous to satisfy the requirements of Rule 56(e), even when proffered . . . by one who claims to have been a participant."). Her retaliation claim based on BPD's interactions with her potential employers after February 2, 2017 thus cannot stand.

The Complaint additionally claimed BPD had retaliated against Doe by providing information to the Washington Post stating "she had essentially been terminated from BPD." [Doc. No. 3 at ¶ 43]. As Defendants note, the record contains no evidence to support this

retaliation claim. Pursuant to a public records request, BPD released records accurately reflecting Doe had resigned with charges pending. [Doc. No. 105-22]. Doe's name ultimately did not appear in the ensuing article, and there is no evidence in the record that this interaction with the Washington Post negatively affected her then-employment. [Doc. No. 105-11 at 45-46]. Accordingly, Doe's retaliation claim related to the Washington Post also fails.

### B. Intentional Infliction of Emotional Distress Claim

As to Doe's intentional infliction of emotional distress claim, as previously noted, the claim was barred to the extent that it arose under Massachusetts law, allowed only to the extent it arose under the law of the District of Columbia and was based on conduct occurring after February 2, 2017. [Doc. No. 43 at 11]. Under D.C. law, a prima facie case of intentional infliction of emotional distress requires Doe to prove "[e]xtreme and outrageous conduct," "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 656 (D.C. 2023). As set forth above, Doe has failed to make any such showing. The record reflects only that Doe authorized and requested BPD to produce her employment and disciplinary records to her prospective employers, and that BPD did so in compliance with its usual practices.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

SO ORDERED.

/s/ Myong J. Joun  
United States District Judge